STEVEN R. KARTAGENER
ATTORNEY AT LAW
225 BROADWAY
SUITE 2700
NEW YORK, NEW YORK 10007

TELEPHONE (212) 732-9600
FAX (212) 732-6966
EMAIL SRK@Kartlaw.com

**BY ECF & MAIL**

May 25, 2012

The Honorable Kiyo A. Matsumoto
United States District Judge
United States Courthouse
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        RE: United States v. Russo, et al.
           Indictment No. 11-CR-30 (KAM)
           **Defendant Michael Castellano**

Dear Judge Matsumoto:

  I represent defendant Michael Castellano (hereinafter "defendant") in the above-entitled criminal action. I am respectfully submitting this letter in connection with defendant's sentencing, which is currently scheduled for June 14, 2012 at 4:00 p.m.

**Introduction**

  Defendant is a 45 year-old man, who, as a result of this conviction, faces a Guidelines sentence of 41 to 51 months' imprisonment, as contained in the Addendum to the Pre-sentence Report (hereinafter "PSR"). This Guidelines range differs from the one found in the plea agreement. However, the parties agree that the one contained in the Addendum to the PSR is correct, due to an inadvertent miscalculation by the parties at the time of defendant's guilty plea.

  We submit that there are significant factors that the Court should consider in sentencing defendant. Despite his involvement in the instant offense, defendant is a husband, and a loving father to his five-year old son, Michael, Jr., who is severely autistic. At the age of two, Michael, Jr., was

diagnosed with Autism/Pervasive Developmental Disorder, a behavioral disorder of speech, communication, social interaction, and repetitive type compulsive behavior. *See* PSR, p. 17, para. 58. A serious collateral effect of any sentence defendant receives is that his son will be without him for an even longer period of time. As a part of our submission, we have attached a report from Dr. Georgi Antar, a leading clinical child psychologist in the field of autism. In her report, Dr. Antar stresses the tremendous negative psychological effect on Michael, Jr.'s development that this separation has caused. Susan Castellano, defendant's wife and mother to their son, has also submitted a letter to the Court illustrating the extreme difficulty in raising their son without her husband. Defendant is heartbroken that he is not able to raise his son and give him the emotional support that his son desperately needs. Each and every day that defendant spends away from his family places a tremendous strain on his wife and child, and hinders his son's development.

Although it does not excuse defendant's conduct, for which he takes full responsibility, defendant has suffered from gambling and drug addiction for most of his adult life. Defendant's association with his co-defendants and his involvement in the instant offense were ways for defendant to fuel these habits. At the age of 45, defendant now knows that he is too old for this, and he is fully committed to working hard each day to put his addictions and past life behind him.

One further mitigating factor that we set forth is that, on January 22, 2001, defendant was sentenced to 33 months' imprisonment for his participation in a wire fraud conspiracy in United States v. Castellano, 01 Cr. 816 (LMM) [SDNY], which is contained in Racketeering Act Three in the instant offense. Although this prior conviction is not treated as relevant conduct pursuant to U.S.S.G. § 2E1.1, and defendant receives some benefit in his Guidelines calculation on the instant offense, we believe that the Court should take this period of imprisonment into consideration, since the conduct for which defendant was previously imprisoned is used as one of the two predicate acts in the current RICO.

We respectfully submit that there comes a point in some people's lives when there is a moment of epiphany, and a realization that a profound change in one's life must be made. Since his arrest in January, 2011, defendant has shown sincere remorse for his actions, and is deeply ashamed for pain that his criminal conduct has caused. Additionally, witnessing the pain that he has caused his family, and viewing his actions with clarity for the first time in many years, defendant has a newfound maturity and respect for the law. He is fully resolved to leading a law-abiding life, so that he can support his family, and be a true father to his son.

For the forgoing reasons and pursuant to the factors set forth in 18 U.S.C. § 3553(a), we respectfully submit that a sentence, below the Guidelines, of time served for the 17 months defendant has already been incarcerated would be appropriate and serve the interests of justice. Alternatively, if the Court decides that a period of incarceration is necessary, we respectfully urge the Court to consider home confinement so that defendant can care for his son.

Hon. Kiyo A. Matsumoto
May 25, 2012
Page 3

### Defendant's Criminal Conduct

Pursuant to a plea agreement, defendant pleaded guilty to Count One of the above-referenced indictment for his participation in a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). Defendant also pleaded guilty to Racketeering Act Three, and Racketeering Act Fifteen, both in violation of 18 U.S.C. § 1343, as the two predicate acts to support the RICO conspiracy. Count One carries a maximum penalty of 20 years' imprisonment and a maximum term of three years of supervised release.

Defendant was a part of a criminal association outlined in Count One of the indictment, and committed and conspired to commit certain crimes in the furtherance of the interests of that association. As charged in Racketeering Act Three, from 1995 until 2000, defendant engaged in a wire fraud scheme in which he conspired with others to defraud money from people who were looking to obtain personal loans. As a part of this scheme, they stole more than $400,000. As we note above, defendant was sentenced to 33 months' imprisonment for this conduct (United States v. Castellano, 01-cr-816 [LMM]).

Additionally, as charged in Racketeering Act Fifteen, from January 2007 until 2011, defendant engaged in a wire fraud scheme through which defendant and his co-defendants wrongfully obtained money orders from MoneyGram. Using confidential identification numbers that they had obtained, defendant placed false telephone calls to MoneyGram outlets and fraudulently obtained money orders in excess of $1,000,000.

### Applicable Guidelines Range

The PSR finds a different Guidelines calculation than the one reached by the parties in the plea agreement. The parties now agree that the PSR's amended Guidelines calculation of 41 to 51 months' imprisonment, which takes into account a two-level reduction for a global disposition pursuant to U.S.S.G. § 5K2.0, is correct. This difference was due to an inadvertent miscalculation by the parties at the time of the guilty plea. Initially, the Probation Department also reached a Guidelines calculation that we believed was incorrect in its first disclosure of the PSR. However, the Probation Department found the calculation in the initial disclosure to be in error, and subsequently amended its calculation in the Addendum to the PSR, dated January 27, 2012.

The Guidelines range in the PSR differs from the plea agreement because the parties incorrectly included Racketeering Act Three in defendant's offense level calculation in the plea agreement. This resulted in an offense level in the plea agreement that is two levels higher than the offense level found in the PSR, due to the grouping of Racketeering Acts Three and Fifteen, pursuant to U.S.S.G. § 3D1.4. The parties now agree that, since defendant already suffered a conviction for the conduct in Racketeering Act Three, this is not counted in the Guidelines calculation for the instant offense. Instead, this conduct is included in defendant's criminal history.

As the Addendum to the PSR points out:

> "Application Note 4 of Guideline 2E1.1 reflects the following:
>
> *'Certain conduct may be charged in the count of conviction as part of a "pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last over act of the instant offense, treat as a prior sentence under 4A1.2(A)(1) and not as a part of the instant offense. This treatment is designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines. If this treatment produces an anomalous result in a particular case, a guidelines departure may be warranted.'*
>
> Consequently, the defendant's prior conviction for Wire Fraud in the Southern District of New York, under Docket No. 01-CR-186, is considered criminal history, not as a part of the instant offense." See Addendum to the PSR, p. 1.

Accordingly, the PSR correctly disregarded the inclusion of Racketeering Act Three in its Guidelines calculation. Taking only Racketeering Act Fifteen into consideration, the PSR starts with the base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1). Since the loss exceeded $1,000,000, under U.S.S.G. § 2B1.1(b)(1)(I), an additional 16 levels are added, and since there was a loss of more than $1,000,000 involving a financial institution, two levels are added under U.S.S.G. § 2B1.1(b)(14)(A). This yields an offense level of 25. The PSR reaches a final offense level of 22 following a three-level reduction for acceptance of responsibility and timely notice to the Government, pursuant to U.S.S.G. § 3E1.1(a) and U.S.S.G. § 3E.1.1(b) respectively. The PSR finds that defendant is in Criminal History Category III, with a total of five criminal history points, due to his previous wire fraud conviction and due to the fact that he committed the instant offense while on supervised release for that previous conviction.

This yields a Guidelines range of 51 to 63 month's imprisonment. Although, the PSR did not find that defendant was eligible for the global plea reduction, it is our understanding that it is the Government's position that defendant is eligible for this reduction. With this further reduction, defendant's total offense level would be 20, with a Guidelines range of 41 to 51 months' imprisonment, which we submit is the correct Guidelines range.

Hon. Kiyo A. Matsumoto
May 25, 2012
Page 5

### Defendant's Five year-old son, Michael, Jr.

We urge the Court to take into consideration the negative impact that defendant's separation has had on defendant's son, Michael, Jr. Dr. Georgi Antar, Psy.D., an eminent clinical child neuropsychologist, performed a comprehensive evaluation of Michael, Jr. in December of 2010. The results of the evaluation were unfortunately not very positive, and were heartbreaking for defendant and his family. Dr. Antar writes:

> "Michael 'Junior' is now five years old. He is severely Autistic and his completely nonverbal. Michael, Jr. and his Father had a very strong attachment, and Mr. Castellano was the only person in the family and also at school, who could manage and sooth this distraught young child, who was then 4 years of age." *See* Report of Dr. Georgi Antar.

The separation from his father has already had a negative impact on Michael, Jr. In a compelling illustration of the effect that this separation has had on Michael, Jr., Dr. Antar writes:

> "In the recent assessment of Michael Jr. on December 23, 2011 by this Examiner, he presented as being very, very sad and also agitated. Michael Jr. is a severely impaired child and cannot understand why his Father is not with him. Mrs. Castellano took her son to see his Father in jail a few days before this past Christmas. The boy flew into his Father's arms, was hysterically crying and he would not let go. They both cried. The boy had to be wrenched away eventually, and the child was bereft. In this child's life, his Father was always very involved with him, and was the only person who could manage him. Mr. Castellano was always very gentle and loving with his son. The one word that the boy is able to say is 'Dada.'" *See* Ibid.

In her assessment, Dr. Antar submits that it is important for defendant to be reunited with his son as soon as possible, for the benefit of Michael, Jr.'s development. She writes:

> "I am urging the Court to take this family situation under consideration for Michael Castellano, and that leniency would prevail. It is extremely difficult to have a severely impaired child, and the family needs all the support they can get. Most importantly, in my years of experience in working with children with such complicated problems, the attachment and involvement of parents is always a major factor in making progress and achieving positive gains. I thank the Court kindly for their consideration." *See* Ibid.

Susan Castellano, defendant's wife and Michael, Jr.'s mother, submits a heartfelt letter concerning her husband's separation from their son. Since defendant's arrest, she has been financially supporting the family while taking care of their son and his numerous medical needs. In her letter to the Court, she describes the tremendous impact of not having her husband at home to care for their son:

> "Michael Jr. requires 24 hours care. While the same holds true for most 5 year olds when it comes to Michael he is non-verbal, and has difficulty communicating. In addition, he has chronic severe allergies to most foods and needs a special diet that consists of all natural all organic homemade food. He requires special school, behavior modification specialist, daily medication, speech therapy, physical therapy, occupational therapy and frequent visits to therapists and doctors. Doing all of this as a 'single' parent is not an easy task, especially when I need to work full time to support not only my son and I, but my son's medical needs a well. When my husband was a part of our everyday life, he tended to Michael's every need. Since my husband has been away the strides we have taken and accomplished with our son's severe condition have taken a turn for a worse. Our son has regressed severely, and the absence of his father has taken a toll on him physically, mentally and emotionally. While I understand that this would happen in most cases with children, for a child who is non-verbal and severely autistic this is detrimental to their success." *See* Letter of Susan Castellano.

In her plea for leniency to the Court, Mrs. Castellano is also expressing the love of a mother for her son. It pains her to be apart from her husband, but it is the potential irrevocable damage to her son that deeply troubles her even more.

> "... I am asking you to show leniency with my husband Michael's sentencing, because I now for a fact that each day Michael is without his father is another day that making progress with his condition lessens. Each day I have to work more hours to support my son and his medical needs is another day that progress is not made with his condition. The sooner my husband can come home to help care for his family the better it will be for Michael to progress. I think you for your time in this matter and truly hope you understand our family's unique situation." *See* Ibid.

Reverend Monsignor David L. Casato, a pastor at the Church defendant's family attends, has also submitted a letter in support of defendant. He also stresses the difficult situation the family has

Hon. Kiyo A. Matsumoto
May 25, 2012
Page 7

been experiencing and hopes that the Court will be lenient in sentencing. He writes:

> "When Michael is not around, his son's behavior regresses. He plays a vital role in his son's progress to deal with everyday life." *See* Letter of Reverand Monsignor David L. Casato.

Defendant's son means the world to him, and he is an essential part of this severely autistic boy's life. Prior to his arrest, from 2008 to 2011, defendant stayed at home to care for his son. *See* PSR, p. 19, para. 70. This separation from his son has made defendant realize his failings, and has given defendant the resolve to do whatever it takes to make sure that he will never again come before the criminal justice system.

**Defendant's Substance Abuse and Gambling Addiction**

We believe that defendant's substance abuse and gambling addiction are two factors that have influenced how defendant has lived his life for over the past two decades. Defendant admits that, over the years, he associated with his co-defendants, in part, because it made it easier to satisfy these addictions. Defendant began abusing illegal drugs as a way to self-medicate for what was up until now undiagnosed depression. While incarcerated at the Metropolitan Detention Center on the instant offense, defendant was diagnosed with depressive disorder and psychosocial and environmental problems. He has since been prescribed Mirtazapine and Trazodone to treat this depression. *See* PSR, p. 17, para. 62.

Although defendant has never used more serious narcotics, he was addicted to marijuana and illegally obtained prescription drugs. Following his arrest in 2001, defendant began using marijuana, which quickly became a daily addiction. In 2007, Defendant also started abusing Xanax and Percocet. *See* PSR, p. 18, para. 66. Defendant took these drugs as a way to cope with what he has expressed was an inability to deal with stress and other negative feelings he had. Eventually, he was using these illegally obtained prescription drugs four to five times a day. Since he has stopped taking illegal drugs due to his incarceration, defendant reported to defense counsel that he is thinking clearly for the first time in years. Although he still has periods of extreme anxiety, the prescription medication has helped defendant feel more mentally and emotionally stable. He has no desire to return to drug abuse, and is willing to undergo drug treatment.

Defendant has also struggled with another serious mental issue that has had a negative impact on the choices that he has made. Defendant has been addicted to gambling for as long as he can remember. *See* PSR, p. 18, para. 64. According to defendant, his father was addicted to gambling, which he believes led to his parents' divorce. *See* PSR, p. 15, para. 53. He began gambling in 1993 by betting on sporting events. This turned into a daily activity, which defendant readily admits quickly spiraled out of control. As noted in the PSR's reference to a prior pre-sentence report, defendant estimated that he had lost more than $800,000 over a 20-year period and became involved

Hon. Kiyo A. Matsumoto
May 25, 2012
Page 8

in the 1995 to 2000 wire fraud to satisfy debtors from whom he had borrowed money. *See* PSR, p. 18, paras. 64-65.

Defendant's mother, who has been supportive of defendant, also provides some insight into the possible genesis of this self-destructive behavior. See Letter of Michele Castellano. She believes that, following a traumatic incident with a police officer when defendant was 14 years old, defendant began to associate with the "wrong people," at which point he began engaging in criminal conduct and began gambling. *See* PSR, p. 16, paras. 54, 55; *see also* Letter of Michele Castellano. Despite numerous intervention attempts by his family, this behavior continued. *See* PSR, p. 16, para. 54. Although defendant had received some treatment for his gambling addiction in the past, he is serious in his desire to commit to future gambling treatment, and put this problem behind him. His mother also believes that defendant will be able to overcome this problem with proper treatment. *See* PSR, p. 16, para. 55. As a person, she described defendant as "family oriented, loving and kind," and an excellent father. *See* PSR, p. 16, paras. 54, 55. She writes:

> "He has always been a wonderful son, helping me, a single mother with disability as much as he coul. He has always been there to step up and make my life a lot easier when I knew I could count on him."
> *See* Letter of Michele Castellano.

She is hopeful that defendant can soon be reunited with his son to help care for him. *See* PSR, p. 16, para. 55; *see also* Letter of Michele Castellano.

Susan Amling, defendant's sister, who loves her brother deeply and has been supportive during this process, also witnessed the problems defendant fell into as a youth. She writes:

> "Together we had the opportunity along with our brother Robert to grow up in a great family environment in Brooklyn. We had many great memories and treasure the life our parents had given us. My parents raised three great kids but somewhere along the way my brother Michael became involved in teenage gambling along with his friends and experimented with drugs. This obviously started him on a path in the wrong direction." *See* Letter of Susan Amling.

As others have stressed in their letters to the Court, Mrs. Amling expresses her hope that defendant can soon return to his family.

> "This saddens me and I always hoped that he would receive the chance to change his path in life especially when he got married to his wife Susanna. She is a really great girl and together they had a baby boy named Michael Jr. who is missing his father deeply. Michael Jr.

> is autistic and can't understand where exactly his dad is but he misses the routines they had and the time spent together at the park. I look forward to the day that my brother can come home and be reunited with his son because they do indeed miss each other very much." *See* Ibid.

As she has told her four children, who miss their "Uncle Mike," she truly believes that:

> "together as a family we can get Uncle Mike the help he needs to put his life back." *See* Ibid.

Defendant has already wasted too many years by succumbing to his addictions and associating with the wrong people. *See* Letter of defendant Michael Castellano. Now, at 45 years of age, and suffering from a myriad of health problems (*see* PSR, p. 18, para. 63), defendant is ready to confront these problems and seek help. We respectfully submit that with proper treatment for his drug abuse and gambling addiction, defendant will be better equipped to deal with these problems, so that he can focus on his son and his family.

### Prior Sentence in United States v. Castellano, 01 Cr. 816 (LMM)

Finally, we urge the Court to consider the prior sentence that defendant received for his wire fraud conviction in United States v. Castellano, 01 Cr. 816 (LMM) [SDNY]. On January 22, 2001, defendant was sentenced to 33 months' imprisonment for his participation in a wire fraud conspiracy in the Southern District of New York. This conviction was for the same criminal conduct as charged in Racketeering Act Count Three in the instant offense, which is one of the two predicate acts that supports defendant's current conviction under the RICO conspiracy. As we have noted above, the Addendum to the PSR's Guidelines calculation takes this into account by only counting this prior conviction in defendant's criminal history, and not as a part of his offense level on the instant offense.

However, since this prior conviction serves to support defendant's conviction under the RICO conspiracy in the instant offense, defendant has, in essence, already served a portion of the sentence that he is to receive on the instant offense. Even though defendant is not entitled to receive "credit" for this prior sentence, we respectfully submit that taking this time that defendant has already served into consideration at sentencing would provide a more fair and equitable result.

Hon. Kiyo A. Matsumoto
May 25, 2012
Page 10

**Conclusion**

      For the above-mentioned reasons and pursuant to the factors set forth in 18 U.S.C. § 3553(a) we respectfully submit that a sentence, below the Guidelines, of time served for the 17 months defendant has already been incarcerated would be appropriate and serve the interests of justice. Alternatively, if the Court decides that a period of incarceration is necessary, we urge the Court to consider a period of home confinement, so that defendant can care for his son. As Dr. Antar has stressed in her report concerning defendant's son, this is a critical time in Michael, Jr's development, and any sentence that defendant receives will have a negative impact on his son. Defendant has learned from this experience, and is ready to put his past behind him. Moving forward, defendant will get the treatment he needs, and we submit, will never come before the criminal justice system again.

                                      Respectfully submitted,

                                      Steven R. Kartagener

cc:    AUSA Elizabeth Geddes
        AUSA Allon Lifshitz